IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | CRIMINAL INDICTMENT NO.: |
| | : | 2:17-CR-00036-RWS-JCF |
| CHRISTOPHER WAYNE BEST | : | |

## ORDER and REPORT AND RECOMMENDATION

This case is before the Court on Defendant's Motion To Suppress Evidence And Statements (Doc. 20). For the reasons discussed below, it is **RECOMMENDED** that Defendant's motion be **DENIED**.

## Procedural History

A Superseding Indictment filed January 23, 2018 (Doc. 13) charges Defendant with possession of methamphetamine with intent to distribute, in violation of 18 U.S.C. §§ 841(a) and 841(b)(1)(B)(viii) (Count One); possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Two); and possession of a firearm by a convicted felon (Count Three). On February 20, 2018 Defendant filed a Motion To Suppress Evidence And Statements (Doc. 20), seeking to suppress evidence seized by law enforcement officers without a warrant from a truck and trailer driven by Defendant on June 20, 2017. The Court conducted a hearing on Defendant's motion on May

1

31, 2018 (*see* Doc. 26), and the transcript was filed on June 22, 2018 (Doc. 32).[1]

The Government obtained an extension of time to file its post-hearing brief (*see* Doc. 34), which it filed on August 2, 2018 (Doc. 35). Defendant did not respond to the Government's brief. The Court now considers the merits of Defendant's motion.

## Discussion

### I. Facts[2]

On June 10, 2017, Aaron Nguyen, a Hall County Sheriff's Deputy assigned to the MANS Unit, received information that patrol deputies had recovered a few ounces of methamphetamine during a traffic stop on Highway 365. (Tr. 8). Nguyen spoke with the arrestee, Terry Phillips, who had written "turn-by-turn directions" to 5661 Maiden Lane, Lula, Georgia in Hall County. (Tr. 8, 11). On May 25, 2017, Deputies had been to that location and arrested Kendra Cardinalli for possession of methamphetamine with intent to distribute. (Tr. 11, 39). Nguyen was the co-case agent on that case and knew that Cardinalli was on bond and had waived her Fourth

---

[1] References to the transcript will be designated as "Tr. __."
[2] These facts are taken from the testimony of Aaron Nguyen, a Hall County Sheriff's Office deputy assigned to the Hall County Multi-Agency Narcotics Squad (MANS) Unit; Bryan Majors, an investigator with the Gainesville Police Department assigned to the MANS Unit; Benjamin Green, an investigator with the Gainesville Police Department formerly assigned to the MANS Unit; and Jeremy Edge, a K-9 handler with the Gainesville Police Department, as well as exhibits admitted during the hearing, including a copy of an Incident Detail Report (Gov't Ex. 3 (Doc. 27-1)) and a recording from Edge's body cam and dashboard cam (Gov't Ex. 4 (Doc. 27-2)).

2

Amendment rights as a condition of her bond as well as a condition of her felony probation. (Tr. 11-12).

Nguyen attempted to conduct surveillance at the Maiden Lane address, but it was difficult to do surveillance because of the way the road is "laid out," so agents with the MANS Unit, including Bryan Majors and Benjamin Green with Gainesville Police Department (collectively referred to as "agents"), went to Cardinalli's house on Maiden Lane on June 20th to conduct a search pursuant to her Fourth Amendment waiver based on their suspicion that drugs were being sold out of her residence. (Tr. 12, 46-47, 75-77, 89). When the agents arrived at 3 p.m. Cardinalli was not present; a woman inside was cleaning and packing and told the deputies that Cardinalli was moving out but had just gone out to "r[u]n somebody somewhere and was coming back." (Tr. 12-14, 47, 50-51, 90). The agents searched the house pursuant to Cardinalli's Fourth Amendment waiver, and they found methamphetamine, drug paraphernalia, and ecstacy tablets. (Tr. 13, 47, 90). They decided to wait for Cardinalli to return, so Nguyen, Majors, and Mayfield remained in the house while the other agents parked down the road. (Tr. 13, 47, 90).

Around 5 p.m., a blue Dodge Ram pulling a trailer pulled out from behind the residence across the street and parked halfway in the roadway and halfway into the grass on Cardinalli's property. (Tr. 15-16, 48). The truck and trailer had North Carolina tags on it. (Tr. 15). The driver got out and walked back toward Cardinalli's

driveway, where there was already a truck and trailer, also with North Carolina tags. (Tr. 15, 48-49). The driver got between the truck and trailer parked in the driveway and "there was a lot of standing and squatting back down[.]" (Tr. 15). The agents did not know the identity of the driver, later identified as Defendant; the woman in custody in Cardinalli's house said she did not know the man's name, but she had seen him at the house. (Tr. 15-16, 49).

Approximately 10 minutes later, Agent Brian Gonzalez, who was also with the MANS Unit, approached from his position down the road, and Agent Majors left the house to make contact with Defendant. (Tr. 16-17, 36-37, 51-53, 60-61). Majors was wearing jeans, a t-shirt, and a vest with the work "Police" on it. (Tr. 52). His firearm and badge were visible, but his weapon was holstered. (Tr. 52-53). Agent Gonzalez was similarly dressed, but his vest said "Sheriff" on it, and his weapon was visible but holstered. (Tr. 53). The agents identified themselves, told Defendant that they were with the MANS Unit and were searching the house, asked him if he knew Cardinalli, and asked him for identification. (Tr. 53-54). Defendant asked why they were asking for his identification, and the agents responded, "Well, because you're driving on a state road here," and Defendant said, "I wasn't driving." (Tr. 65). The agents said, "You were just driving this truck," and Defendant continued to deny it, even though the agents observed him driving the truck through the window of Cardinalli's house. (Tr. 14, 15, 22, 32-33, 48-49, 65). Defendant's

4

denials about driving the truck raised the agents' suspicions about Defendant's actions and possible connection to drug trafficking. (Tr. 65-66, 82).

Defendant told Majors he did not have identification on him, so Majors asked him for his name and date of birth. (Tr. 54-55). Defendant responded that his name was "Brian Sorrells"[3] and gave a date of birth, which they ran through dispatch at 5:31 p.m. (Tr. 19, 55-59; Gov't Ex. 3). Dispatch responded that no license was found for the name and date of birth Defendant provided (*see* Gov't Ex. 3), which raised the agents' suspicions that Defendant either did not have a driver's license and violated state law by driving on a public roadway, or that he was lying to the agents about his identity, which is also a violation of state law. (Tr. 20, 37-38, 59-60). Defendant had also committed a traffic violation because he was parked halfway in the road and halfway in the grass and in the opposite direction of the flow of traffic. (Tr. 20-21, 48, 54).

When the agents received the information from dispatch, Majors asked Defendant, "Are you sure that's who you are?" and told him, "You know, if you're somebody else let us know, or if you don't have a driver's license let us know." (Tr. 61). Defendant insisted he was Brian Sorrells, and Majors noticed that he began to sweat profusely, a vein was pulsing in his neck, and he was breathing heavier. (Tr.

---

[3] The transcript states that Defendant reported his name as "Bryan Sorrels" (*see* Tr. 19), but the Incident Detail Report reflects the spelling as "Brian Sorrells" (*see* Gov't Ex. 3), so the undersigned has used that spelling in this Report.

5

61-62). Majors observed that this behavior was consistent with his observations of others who exhibited this kind of behavior and who subsequently attacked him or ran away, so for officer safety, Majors placed Defendant in handcuffs. (Tr. 63-64). Majors told Defendant that he was placing him in handcuffs "for everybody's safety out here" and that he was "not necessarily under arrest but we do have to figure out what this name issue is." (Tr. 63-64). The agents also suspected that Defendant was there to deliver drugs or had some involvement with Cardinalli's drug activity because they knew about Cardinalli's criminal history with drugs and had found drugs in her house. (Tr. 22-23). Majors also testified that he had been told by the other agents that they had information that methamphetamine was being transported in pull-behind trailers. (Tr. 50, 54, 64).

    Meanwhile, Agent Green went across the street to the residence from where the agents saw Defendant pull the trailer, and he spoke with the resident, who told him that Defendant's name is "Chris," he's a friend of Cardinalli's, and Defendant had asked her if he could park his truck and trailer at her residence. (Tr. 18, 67, 91-92). Because "Chris" is not the name Defendant gave the agents, their suspicions were further heightened. (Tr. 67). Green returned to Majors and gave him that information. (Tr. 34, 92-93). Green also looked inside the truck to try to find identification since the name Defendant had provided was different from the name the neighbor had given and Defendant had not provided any identification, but Green

did not find any identification or evidence of drugs or other contraband. (Tr. 35-36, 95-98, 102). Green did not go into the trailer at that time. (Tr. 102).

The agents requested that Sergeant Sean Bradburn, who was over the Hall County Aggressive Crime Enforcement Unit, come out with a Rapid ID machine to see if Defendant had ever been fingerprinted in order to determine his true identity. (Tr. 21-22, 66-67). Sergeant Bradburn arrived within minutes and fingerprinted Defendant and learned that his name is "Christopher Best," not "Brian Sorrells." (Tr. 23-24, 68-69, 87). They ran Defendant's identifying information through dispatch at approximately 6 p.m. to check for warrants and received information from dispatch that he had a failure to appear warrant from Duluth, Georgia and a possible warrant from Haywood, North Carolina, so they requested that dispatch confirm that those warrants were valid and active. (Tr. 24, 39, 70; Gov't Ex. 3).

The agents also requested a Hall County Sheriff's Office K-9 unit, but there was no K-9 unit on duty, so Agent Green contacted Jeremy Edge, a K-9 handler with the Gainesville City Police Department, who was then dispatched to their location with his dog Alex and arrived at 5:43 p.m. (Tr. 23, 64-65, 99-100, 111-13, 133). Edge has been a K-9 handler for nine years and testified about his training and experience. (Tr. 104-06). Edge had worked with Alex since April 2015. (Tr. 107, 111). Alex was trained by the Department's trainer, including a six-week initial training to teach him to find narcotics and a six-week handler course; Edge

7

participated in all 12 weeks of that training. (Tr. 107-08). Following his training Alex underwent testing and obtained his annual narcotics certifications through the Department as well as national certification through the North American Police Work Dog Association. (Tr. 108-11, 138-39). The testing for the narcotics certification requires the dog to detect narcotics in buildings, cars, and lockers with no more than one miss. (Tr. 109-10).

When Edge arrived, he met with Sergeant House to be briefed about the situation, and then at approximately 5:50 p.m., he ran Alex around the Dodge Ram truck and trailer that Defendant had driven.[4] (Tr. 25, 28, 71, 113-16, 131, 134-135). On the first pass around the trailer, Alex did a "head snap" around the fender well area on the passenger side, thus indicating that he had detected the odor of narcotics. (Tr. 121-22). Edge took him around the rest of the trailer and truck and then returned to the rear of the trailer and started him around in the clockwise direction, and Alex "showed interest on the side door near the bottom," his breathing changed, his tail started wagging slightly, and he almost sat down on the door, which is an indication that he has detected the odor of narcotics. (Tr. 122-23). Edge continued the sniff test, detailing the areas where Alex had shown interest, and Alex continued to show interest when he was taken back to those locations. (Tr. 124-25).

---

[4] Edge recorded the sniff test on his body camera and his dashboard camera. (Tr. 115-17; Gov't Ex. 4).

Edge concluded that, based on his training and experience working with Alex that "we had enough behavior change from the K-9 for a probable cause search of the truck and trailer." (Tr. 125). Edge informed the agents that the dog indicated that he detected narcotics odor coming from the truck and trailer, so the agents searched them. (Tr. 25, 71-73, 125, 126-27). The trailer appeared to be lived in, with a kitchenette and "makeshift toilet." (Tr. 73). The agents found in the trailer methamphetamine, pills that appeared to be ecstacy, an AR-15 rifle, and an empty AR-15 magazine. (Tr. 25, 73-74, 126).

## II.  Analysis

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV. "The 'ultimate touchstone of the Fourth Amendment is reasonableness.' " *United States v. Walker*, 799 F.3d 1361, 1363 (11th Cir. 2015) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). Where a seizure is made without a warrant, as in this case, the burden is on the government to "demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the fourth amendment." *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983).

To determine whether evidence seized from the trailer should be suppressed, the Court must ascertain the legality of: (1) the initial encounter between agents and Defendant; (2) Defendant's seizure and detention; and (3) the warrantless search of the trailer.

### A. The Initial Encounter

"Not all interactions between law enforcement and citizens . . . implicate the scrutiny of the Fourth Amendment." *United States v. Jordan*, 635 F.3d 1181, 1185 (11th Cir. 2011). Courts "have categorized encounters between police and citizens into three types, with varying levels of Fourth Amendment scrutiny: '(1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests.' " *Id.* (quoting *United States v. Perez*, 443 F.3d 772, 777 (11th Cir. 2006)). "The first type of encounter, often referred to as a consensual encounter, does not implicate the Fourth Amendment." *Id.* at 1186. " 'There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets.' " *United States v. Franklin*, 323 F.3d 1298, 1301 (11th Cir. 2003) (quoting *Terry v. Ohio*, 392 U.S. 1, 34 (1968) (White J. concurring)). " 'If a reasonable person would feel free to terminate the encounter, then he or she has not been seized.' " *Perez*, 443 F.3d at 777-78 (quoting *United States v. Drayton*, 536 U.S. 194, 200-01 (2002)). "If the citizen's cooperation is induced by 'coercive means' or if a reasonable person would not 'feel free to

terminate the encounter,' however, then the encounter is no longer consensual, a seizure has occurred, and the citizen's Fourth Amendment rights are implicated." *Jordan*, 635 F.3d at 1186.

Here, Agents Gonzalez and Majors approached Defendant, identified themselves, explained why there were there, asked him if he knew Cardinalli, and asked him for identification. (Tr. 53-54). At that point Defendant was not restrained, the agents had not brandished their weapons or threatened him; they were simply asking him questions. It would not have been reasonable for Defendant to have believed at that point that he could not terminate the encounter, and therefore, the undersigned finds that the agents' initial contact and questioning of Defendant was a consensual encounter and did not implicate the Fourth Amendment.

### B. Defendant's Detention

Shortly after learning from dispatch at 5:31 p.m. that there was no license on file for the name and date of birth provided by Defendant, Majors placed Defendant in handcuffs and told Defendant he was doing so "for everybody's safety out here" and that he was "not necessarily under arrest but we do have to figure out what this name issue is." (Tr. 63-64). At that point Defendant was clearly not free to leave and therefore detained for purposes of the Fourth Amendment.

"With regard to the second category of police-citizen encounters – brief seizures and investigatory detentions, *Perez*, 443 F.3d at 777 – the Fourth

Amendment does not prohibit a police officer, 'in appropriate circumstances and in an appropriate manner [from] approach[ing] a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest[.]' " *Jordan*, 635 F.3d at 1186 (quoting *Terry*, 392 U.S. at 22). "That is, law enforcement officers may seize a suspect for a brief investigatory *Terry* stop where (1) the officers have a reasonable suspicion that the suspect was involved in, or is about to be involved in, criminal activity, and (2) the stop 'was reasonably related in scope to the circumstances which justified the interference in the first place.' " *Id.* (quoting *Terry*, 392 U.S. at 19-20, 30). In evaluating the reasonableness of an investigatory stop, courts consider the "totality of the circumstances," and "[t]here are several issues relevant to this analysis, 'including the law enforcement purposes served by the detention, the diligence with which the police pursue the investigation, the scope and intrusiveness of the detention, and the duration of the detention.' " *United States v. Gil*, 204 F.3d 1347, 1351 (11th Cir. 2000).

The undersigned has considered those factors in light of the facts and circumstances described at the hearing and finds that Defendant's investigatory detention was reasonable and did not impermissibly ripen into an arrest without probable cause in violation of the Fourth Amendment. The agents were present at the house of Kendra Cardinalli—the subject of a drug trafficking investigation—where they had just found drugs when they observed Defendant drive a truck and

pull-behind trailer in the opposite flow of traffic on a public road and park it halfway on the grass and halfway on the roadway in front of Cardinalli's house. They had at least reasonable suspicion, if not probable cause, to believe that Defendant violated the traffic laws of Georgia, thus authorizing them to stop and question Defendant to investigate that violation. Moreover, they had information that drug traffickers used pull-behind trailers to transport methamphetamine, and had just found methamphetamine and other drugs at the residence where Defendant had parked his a truck and trailer. Agents Gonzalez and Majors therefore reasonably approached Defendant and questioned him about his knowledge of Cardinalli and asked him for his identification. When Defendant stated that he did not have identification on him (Tr. 54-55), they then had additional reasonable suspicion that Defendant was driving without a driver's license in violation of state law. The agents then took prompt and appropriate steps to investigate Defendant's identity by running the name and date of birth provided by Defendant through dispatch, which indicated that no license was on file for a person with that name and date of birth. (*See* Gov't Ex. 3). That information then further heightened the agents' suspicion that Defendant was either driving without a license in violation of state law, or lying to them, or both (Tr. 20, 37-38, 59-60), thus justifying further detention of Defendant while investigating those suspicions.

Moreover, Defendant's false claims that he had not been driving the truck and trailer and his change in demeanor as he was being questioned about his identity—breathing rapidly and sweating profusely—increased Majors' suspicions that Defendant was involved in the drug trafficking for which the agents were investigating the residence where Defendant parked the truck and trailer and that he might run or attack the officers as Majors had experienced with other suspects who behaved similarly. (Tr. 61-62, 65-66, 82). Majors therefore reasonably restrained Defendant for officer safety while the agents investigated Defendant's identity and his suspected involvement in drug trafficking. *See, e.g.*, *United States v. Hastamorir*, 881 F.2d 1551, 1557 (11th Cir. 1989) ("The handcuffing of Hastamorir constituted a *Terry* stop, and was a reasonable action designed to provide for the safety of the agents."); *United States v. Kapperman*, 764 F.2d 786, 790 n.4 (1985) (explaining that handcuffing or restraining a detainee does not automatically convert a *Terry* investigative detention into an arrest, and "[p]olice may take reasonable action, based upon the circumstances, to protect themselves during these encounters, or to maintain the status quo").

The agents also acted promptly and reasonably in taking additional steps to learn Defendant's identity and to investigate his suspected involvement in drug trafficking by requesting the Rapid ID fingerprint unit and a K-9 unit to perform a drug sniff. Officer Edge, the K-9 handler, arrived at 5:43 p.m. and began the sniff

14

test around 5:50 p.m. (Tr. 133-34), less than 20 minutes after Majors put Defendant in handcuffs. Through the Rapid ID system, the agents learned that Defendant's identity was "Christopher Best," not "Brian Sorrels" as he had represented, and when they ran that information through dispatch, dispatch reported at 6:00 p.m. that there were outstanding warrants for him, no more than 30 minutes after Majors handcuffed him.

The undersigned finds that the agents diligently pursued methods designed to determine Defendant's identity and whether he had a valid driver's license and to investigate his suspected involvement in drug trafficking. The scope, intrusiveness, and duration of the detention were reasonable in light of the purposes served by the detention and the evolving circumstances which heightened the agents' suspicions as the encounter with Defendant continued, i.e., "[e]ach investigatory act logically led to the next act which was done without delay." *United States v. Acosta*, 363 F.3d 1141, 1146 (11th Cir. 2004). Thus, the investigatory detention was reasonable and did not impermissibly ripen into an arrest without probable cause in violation of the Fourth Amendment. *See, e.g.*, *United States v. Lester*, 477 Fed. Appx. 697, 701 (11th Cir. 2012) (finding that 30 to 40 minute detention was reasonable and did not exceed the scope of detention allowed under *Terry*); *Gil*, 204 F.3d 1350-51 (finding that 75-minute investigative detention during which the defendant was handcuffed in a police car was not unreasonable where the agents "detained [her] for only as

long as it was necessary to complete their investigation of the residence," and handcuffing and detaining her in the police car was reasonable in order to "maintain the safety of the officer and the ongoing investigation of the residence").

### C. The Search Of The Trailer

The automobile exception to the warrant requirement authorized the agents' search of the truck and trailer following the K-9 sniff test.[5] That exception "allows the police to conduct a search of a vehicle if (1) the vehicle is readily mobile; and (2) the police have probable cause for the search." *United States v. Lindsey*, 482 F.3d 1285, 1293 (11th Cir. 2007). "[O]fficers can [also] search any container in an operational car without a warrant as long as they have probable cause to believe that the container holds evidence of a crime." *United States v. Magluta*, 418 F.3d 1166, 1182 (11th Cir. 2005). "The mobility requirement is satisfied whenever the vehicle to be searched is operational." *United States v. Garcia*, 433 Fed. Appx. 741, 744 (11th Cir. 2011) (unpublished decision) (citing *United States v. Watts*, 329 F.3d 1282, 1286 (11th Cir. 2003)). "A functioning vehicle is considered to be 'mobile' even if it already has been secured by the police." *Id.* (citing *Michigan v. Thomas*,

---

[5] The Supreme Court in *Arizona v. Gant*, 556 U.S. 332, 343 (2009) "placed limitations on searches incident to arrest; it did not affect the longstanding law regarding the automobile exception to the search warrant requirement." *United States v. Ilonzo*, No. 1:12-CR-276-SCJ-GGB, 2015 U.S. Dist. LEXIS 136783, at *49 (N.D. Ga. May 18, 2015), *adopted by* 2015 U.S. Dist. LEXIS 135895 (N.D. Ga. Oct. 6, 2015).

16

458 U.S. 259, 261 (1982) and *United States v. Birdsong*, 982 F.2d 481, 483 (11th Cir. 1993)). "Police have probable cause to search a vehicle when under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in the vehicle." *Id.* (internal quotations omitted).

Here, the truck and trailer were mobile as the agents observed Defendant drive the truck and attached trailer and park them at Cardinalli's residence. Moreover, the fact that a trained and certified drug K-9 positively alerted to the odor of narcotics in the trailer gave the agents probable cause to believe that narcotics were inside.[6] *See United States v. Nelson*, 309 Fed. Appx. 373, 375 (11th Cir. 2009) (unpublished decision) ("In the case of drug sniffs, 'probable cause arises when a drug-trained canine alerts to drugs.' " (quoting *United States v. Banks*, 3 F.3d 399, 402 (11th Cir. 1993)); *United States v. Barnes*, 807 F. Supp. 2d 1154, 1266 (N.D. Ga. 2010) ("Probable cause is established in this case by the alert of the drug certified K-9, Junior."), *adopted by* 807 F.2d 1154, 1168 (N.D. Ga. 2011). "A dog sniff must be sufficiently reliable in order to establish probable cause, and this reliability is generally present if the dog is 'well-trained.' " *Nelson*, 309 Fed. Appx. at 375. Here, Officer Edge testified that he had worked with Alex for over two years when he conducted the sniff test at issue in June 2017, Alex had undergone 12 weeks of

---

[6] The canine sniff of the exterior of the truck and trailer did not constitute a search for Fourth Amendment purposes. *See United States v. Nelson*, 309 Fed. Appx. 373, 375 (11th Cir. 2009); *United States v. Glinton*, 154 F.3d 1245, 1257 (11th Cir. 1998).

training, including narcotics detection, and as of June 2017, Alex was certified in narcotics detection by both the Department and the North American Police Work Dog Association, which required testing in narcotics detection. (Tr. 107-111, 138-39). The undersigned finds that Edge's credible testimony shows that Alex is well-trained and the results of the dog sniff in this case were sufficiently reliable to establish probable cause to search the truck and trailer.[7] *See, e.g.*, *Nelson*, 309 Fed. Appx. at 375 (finding that the district court "did not err when it denied Nelson's motion to suppress on the ground the dog was reliable and its response provided the officers with probable cause to search the car" based on evidence of the dog's training, certification, testimony about the handler's familiarity with the dog's performance and reactions because of their training together).

Because the agents did not violate Defendant's Fourth Amendment rights by approaching and questioning him, detaining him, and searching the trailer where the evidence sought to be suppressed was found, it is **RECOMMENDED** that Defendant's motion to suppress evidence be **DENIED**.[8]

---

[7] The finding of probable cause is supplemented by additional facts, including Defendant's false statements to the officers about his identity, his denials that he was driving the truck, and the fact that he had parked the truck and trailer at the house of someone who had been arrested for possession of methamphetamine with intent to distribute and was under investigation for ongoing drug trafficking activity, and where drugs had just been found that day.

[8] Defendant styled his motion to suppress a Motion To Suppress Evidence *And Statements* (Doc. 20), but he did not elaborate on the factual or legal basis for his request that evidence of his statements be suppressed. To the extent that he contends

18

**Summary**

For the reasons discussed above, it is **RECOMMENDED** that Defendant's Motion To Suppress Evidence And Statements (Doc. 20) be **DENIED**.

**IT IS ORDERED** that, subject to a ruling by the District Judge on any objections to orders or recommendations of the undersigned Magistrate Judge, this case is **certified ready for trial.**

**IT IS SO ORDERED, REPORTED AND RECOMMENDED** this 17th day of September, 2018.

/s/ J. Clay Fuller
J. Clay Fuller
United States Magistrate Judge

---

that they should be suppressed on Fourth Amendment grounds, as discussed above, the undersigned finds that his Fourth Amendment rights were not violated, and therefore, his motion to suppress evidence, including his statements, should be **DENIED**.